IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

CHAD STEFANI,                          *
                                       *
     Plaintiff,                        *
                                       *
     v.                                *          CV 115-164
                                       *
CITY OF GROVETOWN, a municipality      *
of the State of Georgia; GARY          *
JONES, individually and in his         *
official capacity; and JONES           *
NALLEY, individually and in his        *
official capacity,                     *
                                       *
     Defendants.                       *

_____

O R D E R

_____

     This matter came before the Court on a motion to dismiss
in September 2016. In accordance with the legal standards
applicable to motions to dismiss, this Court had to accept all
factual allegations of the Amended Complaint (doc. 20) as
true. Now, following discovery, the parties come back before
the Court on cross-motions for summary judgment with a more
developed and extensive factual background. Defendants have
also filed a motion to limit the expert testimony of
Plaintiff's witness, J. Douglas Parker. Having thoroughly
read and considered the record and the parties' briefs, the
Court resolves the matter as follows.

## I. BACKGROUND

### A. Overview of Remaining Claims

This case arises out of Plaintiff Chad Stefani's arrest by Defendant City of Grovetown's Department of Public Safety ("GDPS") on February 17, 2015. After a citizen's complaint in the early afternoon and a brief investigation by the GDPS, the Columbia County magistrate judge issued arrest warrants for Plaintiff for attempted child molestation. Plaintiff turned himself in to the GDPS that evening. He was arrested and remained in custody until his release after a preliminary hearing was held on March 31, 2015.

On October 13, 2015, Plaintiff filed the instant case alleging constitutional violations for unlawful arrest, unlawful detention, and unlawful search. These federal claims were brought under 42 U.S.C. § 1983. Plaintiff also alleged state law claims of negligence, false/malicious arrest, false imprisonment, and malicious prosecution.

On September 2, 2016, this Court granted in part and denied in part Defendants' motion to dismiss. Thereafter, Plaintiff's § 1983 claims against Defendant City of Grovetown, Defendant Gary Jones, the Chief of Police, and Defendant Jones Nalley, a GDPS investigator, remained as well as the state-law claims for malicious prosecution and negligence against the City of Grovetown.

## B.    Factual Background[1]

At around 12:49 p.m. on February 17, 2015, Rachel Lucas called the GDPS and spoke with the dispatcher. (Pl.'s Resp. to St. of Material Facts, Doc. 88, ¶ 1.) Lucas reported that a man had just come to her house in a blue, four-door Dodge Ram pickup truck and asked if she had any daughters.[2] (Nalley Dep. Part I (Feb. 2, 2017), Doc. 72-1, at 60-62.) The man stated that he "was thinking about having a kid" and wanted to spend "some alone time" with Lucas's daughters. (Id.) The dispatcher instructed Lucas to come to the police department. (Id.)

When Lucas arrived at the police station, she met with Sergeant Christopher Powell, a road patrol officer. Lucas told Sergeant Powell what happened and provided a description of the truck and of the man. (Lucas Dep. at 47; Powell Dep., Doc. 64-7, at 61.) Lucas told Sergeant Powell that the man had offered her $200 to spend time alone with her daughters.

---

[1]    On a motion for summary judgment, the Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in his favor." United States v. Four Parcels of Real Prop. in Greene and Tuscaloosa Cntys., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted).

[2]    Lucas actually had three daughters and a son, all under the age of 10, whom she was loading into her car at the time of the encounter. (Lucas Dep., Doc. 69-3, at 10-11, 43-44.)

3

(Powell Dep. at 62.)

Lucas provided a written statement at that time:

> I was putting my children in the car and a white male in a blue dodge 4 door pick-up pulled up on the side of my house & got out and was gona (sic) knock on my door & I said can I help you, he asked if I wanted to make some extra side money. He said he was thinking about having kids and wanted to know if I had daughters that he can spend time with. I say no sir and he asked how many kids I have. I told him it was none of his concern, and that he was willing to pay $200.00 an hour to spend alone time with them. His truck had no tag.

(Doc. 64-4; Lucas Dep. at 55.) Sergeant Powell then wrote the names of the daughters and their ages on the back of the statement, along with a description of the man. (Doc. 64-4; Powell Dep. at 64-65.) Sergeant Powell reported the incident to his superior, Captain Scott Wheatley. Sergeant Powell also called the District Attorney's office to inquire about whether a crime had been committed. (Powell Dep. at 74-76.) The District Attorney's office informed him that the suspect could be charged with "criminal attempt to commit child molestation." (Powell's Incident Report, Doc. 64-18; see also Bray Dep., Doc. 67-2, at 17-19 ("I never told them to go take out a warrant and arrest a person for that. I just gave them a potential charge. . . . I'm not the one that has to worry about probable cause to arrest someone. I don't have to worry about taking out warrants, [the officers] do.").)

Shortly after Lucas filed her complaint, Defendant Gary

4

Jones, the Chief of Police, issued a statement on the GDPS's Facebook page. The statement began: "PARENT ALERT!!!!!!!!!!!!!," followed by a description of the suspect, the truck, and the incident. The statement asks anyone that sees the vehicle or the suspect to call the GDPS. (Pl.'s Resp. to St. of Material Facts, ¶ 9.) In response thereto, a male tipster called the GDPS at 2:10 p.m. and spoke with Sergeant Powell. The male tipster advised the GDPS to look up Chad Stefani (the plaintiff herein) because he drives a blue four-door Dodge Ram truck and had previously been in trouble for "flashing women around Columbia County." (Id. ¶ 10; Powell Dep. at 87-89.)

At the male tipster's behest, Sergeant Powell googled "Chad Stefani Augusta GA," which yielded a newspaper article with his picture. (Powell Dep. at 102.) Sergeant Powell immediately called Lucas and instructed her to perform the same google search. (Id. at 97-98.) Sergeant Powell informed Lucas that he had received an anonymous tip that Chad Stefani drove the same type of vehicle and he wanted to know if Lucas recognized him as the man that approached her and her children. (Id. at 100.) Lucas said that she would, and they hung up the phone. (Id.) A few moments later, Lucas called Sergeant Powell back and stated that the picture on the internet "looked just like him." She explained: "I don't want

5

to like be like a hundred percent, yeah, bam, that's him, but he looks identical. The only thing different was this man had a hat on so I didn't see if he had hair really good or if he was bald." (Id. at 104.) Powell asked again if the picture "looked exactly like him" and Lucas responded "yes." (Id.)

After speaking with Lucas, Sergeant Powell called Captain Wheatley to inform him that she had identified Plaintiff as the suspect. Captain Wheatley then called Columbia County Sheriff's Office and asked that the office send to the GDPS any information it had on Plaintiff to include a mug shot. (Prelim. Hrg. Tr. of Michelle Carter, Doc. 75-1, at 28.) Captain Wheatley also requested that a photographic line-up be prepared for the GDPS's use. (Id. at 28-29.)

In the meantime, Defendant Jones also called a deputy with the Columbia County Sheriff's Office to inquire about an incident at the local Wal-Mart. The two men determined that the incidents were unrelated because the suspect descriptions were different. (Pl.'s Resp. to St. of Material Facts, ¶ 17.) In a subsequent phone call, wherein Defendant Jones mentioned that the GDPS has identified Plaintiff as a suspect, the deputy pointed out to Defendant Jones that the GDPS's description as a "strawberry blonde with goatee" did not match the Chad Stefani he knew, who was "bald-headed with a dark

beard." (Prelim. Hrg. Tr. of Calvin Morris at 32-33.)
Nevertheless, Defendant Jones asked the deputy to send the
photographic line-up over to make it official. (Id. at 35.)

At approximately 3:30 p.m., Captain Wheatley assigned the
case to Defendant Nalley, who had just started his shift.
(Nalley Dep. Part I at 77.) Captain Wheatley told Defendant
Nalley about Lucas's complaint and the D.A. Office's suggested
charge. (Id. at 77-78, Nalley Dep. Part II (Mar. 2, 2017),
Doc. 69-1, at 158-59.) Also, Captain Wheatley told Defendant
Nalley that Lucas said she would be able to recognize the
suspect if she saw him again and that the suspect had been
identified. (Nalley Dep. Part I at 78; Nalley Dep. Part II at
159.) Captain Wheatley told Defendant Nalley that a
photographic lineup was being prepared. (Nalley Dep. Part I
at 93-94; Nalley Dep. Part II at 137, 159.)

At 4:30 p.m., Lucas came to the GDPS, at which time
Defendant Nalley and Captain Wheatley showed her the
photographic line-up. (Nalley Dep. Part I at 94-95.) The
photograph of Plaintiff in the line-up was different than the
one Lucas had previously seen on the internet. (Pl.'s Resp.
to St. of Material Facts, ¶ 26.) Upon being shown the
photographic line-up, Lucas "immediately" and "adamant[ly]"
identified Plaintiff as the suspect. (Nalley Dep. Part I at
95; Nalley Dep. Part II, at 250; Lucas Dep. at 119, 141.)

After obtaining Lucas's positive identification, Defendant Nalley prepared three warrants for Plaintiff and went to the county magistrate judge. The warrants charged the crime of Criminal Attempt (Child Molestation), one warrant for each of Lucas's daughters. (Am. Compl., Doc. 20, Exs. P, Q & R.) The warrants described the offense as follows: "[The] accused attempted to solicit[] said victim at the rate of $200.00 an hour, for the purpose of sexual gratification and to in pregnant (sic)." (Id.) Defendant Nalley informed Magistrate Judge Connie Washington of: Lucas's allegation that the suspect had tried to pay money in exchange for spending time with her young daughters; Lucas's description of the suspect and the vehicle; and Lucas's identification of Plaintiff in a photographic lineup. (Nalley Dep. Part I at 94-98; Washington Dep., Doc. 69-2, at 28.) The magistrate judge issued arrest warrants for Plaintiff at 4:50 p.m. on February 17, 2015. (Pl.'s Resp. to St. of Material Facts, ¶ 39.)

Defendant Jones posted an update on the GDPS Facebook page, indicating that they had arrest warrants for Plaintiff and that he should turn himself in. (Id. ¶ 40.) That evening, Plaintiff learned of the post from a friend. (Pl.'s Dep. Part I (Feb. 1, 2017), Doc. 67-4, at 102.) Plaintiff, along with his fiancee, Ms. Britland Gove, called an attorney.

(Id. at 103.) While they were on the phone with the attorney, Defendant Jones called Ms. Gove and left a voicemail message. (Britland Stefani Dep., Doc. 68-2, at 50; Pl.'s Dep. Part II (Mar. 22, 2017), Doc. 70-1, at 85-86.) Ms. Gove called Defendant Jones back to let him know that she was bringing Plaintiff to the GDPS. Defendant Jones asked to speak with her upon her arrival. (Britland Stefani Dep. at 51.) When Ms. Gove dropped Plaintiff off at the GDPS around 9:50 p.m., she was taken to meet with Captain Wheatley and Defendant Jones in Defendant Jones's office. (Id. at 56.) During their conversation, Ms. Gove told them that Plaintiff's truck had been parked under video surveillance at his workplace all day and that Plaintiff had been driving a white company truck. (Id. at 57-58, 62-63.) At this point, Ms. Gove called Plaintiff's brother and boss, Mr. Brian Stefani, so that he could verify this information for Defendant Jones. (Id. at 58; Brian Stefani Dep., Doc. 68-1, at 58-60 ("I told [Defendant Jones] we have [video surveillance] at the shop and I'd help him any way that I could and [Plaintiff] did not do this, he had the wrong guy.").) Ms. Gove also pointed out that Plaintiff has alopecia and is bald; therefore, he did not match the description posted on the Facebook page. (Britland Stefani Dep. at 60.) Ms. Gove testified that Defendant Jones remained confident that he had the right person and was

9

dismissive of the information she had provided. (Id. at 64, 66.)

At approximately 10:46 p.m., Defendant Nalley and Defendant Jones met with Plaintiff in an interview room at the GDPS. Before invoking his Fifth Amendment rights, Plaintiff told them: "I didn't do this." (Pl.'s Dep. Part I at 104.) He also told them that his truck was parked and he had not driven it. (Id. at 105.) Plaintiff was then placed under arrest. (Pl.'s Resp. to St. of Material Facts, ¶ 52.)

The morning after Plaintiff's late evening arrest, Defendant Nalley went to Plaintiff's workplace, the electrical business owned by his brother, Brian Stefani. (Brain Stefani Dep. at 11.) Defendant Nalley asked Brian Stefani if he could look at Plaintiff's truck and the video surveillance. (Id. at 68-69.) Brian Stefani refused until Defendant Nalley obtained a search warrant. (Id. at 69.)

At approximately 12:35 p.m. on February 18, 2015, Defendant Nalley obtained a search warrant for the truck and the video at Plaintiff's workplace as requested by Brian Stefani. (Nalley Dep. Part II at 217.) He also obtained a search warrant for clothing items matching Lucas's initial description of the suspect from Ms. Gove's residence, which she shared with Plaintiff. (Id. at 217-18; see Am. Compl., Ex. S.)

When Defendant Nalley returned to Plaintiff's workplace, he viewed the video surveillance of the truck, which showed that Plaintiff's truck was not moved during the relevant time period. (Nalley Dep. Part II at 220-21; Brian Stefani Dep. at 89-90, 92-93; Nalley Dep., Ex. 5 (Doc. 74-1), Investigative Notes-Entry for 12:50 p.m. on 2/18/15.) On February 24, 2015, Defendant Nalley searched Ms. Gove's home and only seized a flannel shirt. (Nalley Dep., Ex. 5, Investigative Notes-Entry for 2/24/15.) Finally, the record evidence further shows that in the days following Plaintiff's arrest, Ms. Gove found a receipt for Plaintiff's purchase of lunch at Taco Bell at 1:07 p.m. on the day of incident. (Britland Stefani Dep. at 69.) She turned it over to Plaintiff's defense counsel. (Id.) At some point in early March, the investigator hired to help in the defense of Plaintiff obtained video footage from Taco Bell, which shows Plaintiff getting lunch at the Taco Bell in the white company truck shortly after the incident had occurred. (Christine Dep., Doc. 67-1, at 58-59.)

Ultimately, a specially set preliminary hearing was held on March 31, 2015, before a magistrate judge from another county. At the conclusion of the hearing, Magistrate Judge Bryant Swan dismissed the charges because under the circumstances, "there [we]re no substantial steps in furtherance of the commission of the crime of child molestation." (Prelim. Hrg. Tr. at 51.)

## II. SUMMARY JUDGMENT STANDARD

The Court should grant summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The purpose of the summary judgment rule is to dispose of unsupported claims or defenses which, as a matter of law, raise no genuine issues of material fact suitable for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

In this case, both Plaintiff and Defendants have filed motions for summary judgment. "The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed." Southern Pilot Ins. Co. v. CECS, Inc., 2 F. Supp. 3d 1240, 1242-43 (N.D. Ga. 2014) (citing Am. Bankers Ins. Group v. United States, 408 F.3d 1328, 1331 (11th Cir. 2005)).

In considering a motion for summary judgment, all facts and reasonable inferences are to be construed in favor of the nonmoving party. Hogan v. Allstate Ins. Co., 361 F.3d 621, 625 (11th Cir. 2004). Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless the factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of

> substantive law dictate the materiality of a
> disputed fact. A genuine issue of material fact
> does not exist unless there is sufficient evidence
> favoring the nonmoving party for a reasonable jury
> to return a verdict in its favor.

Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoted source omitted) (emphasis supplied). The party opposing the summary judgment motion, however, "may not rest upon the mere allegations or denials in its pleadings. Rather, its responses . . . must set forth specific facts showing that there is a genuine issue to be tried." Walker v. Darby, 911 F.2d 1573, 1576-77 (11th Cir. 1990).

The Clerk gave the nonmoving parties notice of the summary judgment motion and the summary judgment rules, of the right to file affidavits or other materials in opposition, and of the consequences of default. (Docs. 61 and 66.) Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied. The time for filing materials in opposition has expired, and the motions are ripe for consideration.

## III. DISCUSSION

Plaintiff asserts federal claims pursuant to 42 U.S.C. § 1983. Section 1983 creates a federal remedy for deprivations of federal rights. Wideman v. Shallowford Community Hosp., Inc., 826 F.2d 1030, 1032 (11th Cir. 1987). An actionable §

1983 claim requires proof of a deprivation of rights, privileges or immunities secured by the Constitution and laws of the United States and that the deprivation was by a person or persons acting under color of law.[3]  Id.

Plaintiff alleges that Defendants violated his constitutional rights by subjecting him to a malicious prosecution and an unlawful search.  Plaintiff asserts his claims against Defendant City of Grovetown and its employees, Defendants Jones and Nalley, in their official and individual capacities.  Plaintiff's claims against Defendants Jones and Nalley in their official capacities are the functional equivalent of claims against the entity for which they are employed - the City of Grovetown.  See Kentucky v. Graham, 473 U.S. 159, 166 (1984) ("[A]n official capacity suit is, in all respects other than name, to be treated as a suit against the entity."); Busby v. City of Orlando, 931 F.2d 764, 776 (11th Cir. 1991).  Accordingly, Plaintiff's claims exist against Defendant City of Grovetown and Defendants Jones and Nalley in their individual capacities.

Plaintiff also has state law claims for malicious prosecution and negligence against the City of Grovetown.  The state law claims will be addressed last.

_____

[3]  It is undisputed that Defendants acted under color of law in this case.

14

## A.  Malicious Prosecution

Because Plaintiff was arrested pursuant to a warrant, his claim is properly construed as a malicious prosecution claim. Carter v. Gore, 557 F. App'x 904, 906 (11th Cir. 2014). A § 1983 claim for malicious prosecution arises under the Fourth Amendment.  Grider v. City of Auburn, Ala., 618 F.3d 1240, 1256 (11th Cir. 2010).  To establish a § 1983 malicious prosecution claim, the plaintiff must prove two things: (1) the elements of the common law tort of malicious prosecution; and (2) a violation of his Fourth Amendment right to be free from unreasonable seizures.  Id. (citing Kingsland v. City of Miami, 382 F.3d 1220, 1234 (11th Cir. 2004)).  "As to the first prong, the constituent elements of the common law tort of malicious prosecution are:  '(1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused.'"  Id. (quoting Wood v. Kesler, 323 F.3d 872, 881 (11th Cir. 2003)).  As to the second prong, it is well established that an arrest without probable cause is an unreasonable seizure that violates the Fourth Amendment. Id. (citing Brown v. City of Huntsville, Ala., 608 F.3d 724, 734 (11th Cir. 2010)).  Consequently, the existence of probable cause negates both prongs and defeats a § 1983 malicious

prosecution claim. Id.

In this case, Defendants stake their motion for summary judgment on the existence of probable cause.[4] Plaintiff, however, filed a cross-motion for summary judgment, in which he asserts that probable cause was lacking as a matter of law.

1. Actual Probable Cause

For probable cause to exist, an arrest must be objectively reasonable based on the totality of the circumstances. Wood, 323 F.3d at 882. Probable cause to arrest exists where the facts and circumstances within the police officer's knowledge "warrant a reasonable belief that the suspect had committed or was committing a crime." Case v. Eslinger, 555 F.3d 1317, 1327 (11th Cir. 2009) (quoted source omitted). "Probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Atterbury v. City of Miami Police Dep't, 322 F. App'x 724, 727 (11th Cir. 2009) (quoted source omitted). "Thus, an officer must have something more than mere suspicion but he may have less than convincing proof." Id. (cited source omitted).

Whether the facts and circumstances give rise to actual probable cause for an arrest depends on the elements of the crime. Crosby v. Monroe Cnty., 394 F.3d 1328, 1332 (11th Cir.

_____

[4] Defendants also contend that there is no evidence of malice in the case. This element will be discussed infra.

16

2004). Plaintiff was arrested for criminal attempt to commit child molestation. Under Georgia law, a person commits the crime of child molestation "when such person does any immoral or indecent act to or in the presence of or with any child under the age of 16 years *with the intent to arouse or satisfy the sexual desires* of either the child or the person." O.C.G.A. § 16-6-4 (emphasis added). "[T]he law against child molestation . . . proscribe[s] acts which offend against the public's sense of propriety as well as to afford protection to a child's body in those cases where the act or acts are more suggestive of sexually oriented misconduct than simply assaultive in nature." <u>Benson v. Facemyer</u>, 657 F. App'x 828, 834 (11th Cir. 2016) (quoting <u>Chapman v. State</u>, 318 S.E.2d 213, 214 (Ga. Ct. App. 1984)). "A person commits the offense of criminal attempt when, *with intent to commit a specific crime*, he performs any act which constitutes a substantial step toward the commission of that crime." O.C.G.A. § 16-4-1 (emphasis added).

In this case, the suspect told Rachel Lucas, the mother of children under the age of 16, that he wanted to have kids and then offered to pay her $200 an hour to spend time alone with her daughters. The officers then assumed this offer was a substantial step manifesting the suspect's intent to commit child molestation. With this assumption, the officers assumed

17

that the suspect's motive was to arouse or satisfy sexual desires. The warrant read that the accused solicited Lucas "for the purpose of sexual gratification and to in pregnant (sic)." Aside from the officers' assumption, however, there is no evidence of the suspect's intended purpose. The Court concedes that an offer to pay $200 an hour to spend time alone with prepubescent children is odd and socially improper, perhaps even "creepy" as opined by defense counsel (Lucas Dep. at 112), but without any evidence of the suspect's purpose, there is not a probability or substantial chance that he intended to commit child molestation.[5] Speculation or mere suspicion of his intended purpose does not give rise to probable cause. Thus, as a matter of law, no reasonable officer under these facts and circumstances would have believed that a crime had been committed.

    2. <u>Malice</u>

Now that the Court has determined that there was no probable cause to support Plaintiff's arrest and prosecution, it must ensure that all other elements of a § 1983 malicious prosecution claim are met as a matter of law prior to entering

---

    [5] Rachel Lucas's testimony demonstrates this point. When asked if there was any doubt in her mind that the suspect wanted to do something improper with her daughters, she responded: "Who's to say." (Lucas Dep. at 112.) Additionally, Defendant Jones conceded at the preliminary hearing that Lucas did not mention that the suspect wanted to have sex or "anything like that" in her initial report. (Prelim. Hrg. Tr. at 22.)

judgment in Plaintiff's favor.  It is undisputed that a criminal prosecution was instituted against Plaintiff as a result of his arrest and that it terminated in Plaintiff's favor when the charges were dismissed at the preliminary hearing.  It is also beyond dispute that Plaintiff suffered damages, having spent 42 days in jail illegally, though the amount of damages is a matter yet to be determined.  The remaining element involves the presence of malice.

Defendants contend that there is no evidence of malice. The malice element of malicious prosecution shows in "personal spite or . . . a general disregard of the right consideration of mankind, directed by chance against the individual injured." Smith v. City of Hartwell, 2014 WL 1491137 (M.D. Ga. Apr. 15, 2014) (citing Franklin v. Consol. Gov't of Columbus, Ga., 512 S.E.2d 352, 356 (Ga. Ct. App. 1999)). "Malice may be inferred from a total lack of probable cause; however, evidence of malice cannot rely solely on 'proof of the want of probable cause [if] that proof shows some circumstances pointing to the guilt of the accused.'" Id. (quoting Franklin, 512 S.E.2d at 356).

In brief, Defendants argue that the Court cannot simply rely upon the lack of probable cause to infer malice because there was evidence pointing to Plaintiff's guilt such as the photographic line-up and the description of the truck matching

Plaintiff's truck. Defendants' focus on their identification of the suspect as a reasonable mistake presumes that a crime had been committed. There had not been. The Court has not determined that there is a total lack of probable cause to suspect Plaintiff; rather, there is a total lack of probable cause to support any arrest. Thus, it is irrelevant whether evidence pointing to the guilt of the accused, Plaintiff, exists. Simply put, the arrest of anyone under the facts and circumstances of this case demonstrates a total lack of probable cause so that malice may be inferred as a matter of law.

### 3.   Municipal Liability

Defendant City of Grovetown contends that even if there has been a constitutional violation, it cannot be held liable. It is axiomatic that municipalities cannot be "vicariously liable under § 1983 for their employees' actions." Connick v. Thompson, 563 U.S. 51, 60 (2011); Griffin v. City of Opa-Locka, 261 F.3d 1295, 1307 (11th Cir. 2001). "To impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004).

While Plaintiff has not shown, or even alleged, a policy or custom in this case, "[a] municipality may be held liable for a single act or decision of a municipal official with final policymaking authority in the area of the act or decision." <u>McMillan v. Johnson</u>, 88 F.3d 1573, 1577 (11ᵗʰ Cir. 1996) (citations omitted), <u>aff'd sub nom. McMillan v. Monroe Cty., Ala.</u>, 520 U.S. 781 (1997). Here, Defendants concede that Defendant Jones, the Chief of Police of the City of Grovetown's Department of Public Safety, had final policymaking authority over the arrest of Plaintiff. Moreover, Defendant Jones was personally involved in the investigation and identification of Plaintiff. Indeed, Defendant Jones was present at the time Plaintiff was arrested. Accordingly, Defendant Jones's conduct supports municipal liability in this case.

4. <u>Individual Liability</u>

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Benson</u>, 657 F. App'x at 832 (quoting <u>Wood</u>, 323 F.3d at 877, and <u>Vinyard v. Wilson</u>, 311 F.3d 1340, 1346 (11ᵗʰ Cir. 2002)). Absent probable cause, Defendants Jones and Nalley are still entitled to qualified immunity if "arguable

probable cause" exists.  <u>Case</u>, 555 F.3d at 1327; <u>see</u> <u>Jones v. Cannon</u>, 174 F.3d 1271, 1283 n.3 (11th Cir. 1999) ("Arguable probable cause, not the higher standard of actual probable cause, governs the qualified immunity inquiry.").

Arguable probable cause exists "where reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest the plaintiffs."  <u>Scarbrough v. Myles</u>, 245 F.3d 1299, 1302 (11th Cir. 2001) (quoted sources omitted).  This standard recognizes that a law enforcement official may make a reasonable but mistaken judgment regarding probable cause. <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009); <u>Skop v. City of Atlanta, Ga.</u>, 485 F.3d 1130, 1137 (11th Cir. 2007).

Here, Defendants argue that a reasonable officer in their circumstances could have believed, even if mistakenly so, that probable cause existed.  They point out that even the District Attorney's office and a detached neutral magistrate believed that a crime had been committed.

The facts of the instant case are similar to  the facts in <u>Benson v. Facemyer</u>, 657 F. App'x 828, wherein the Eleventh Circuit was faced with the same issue: whether arguable probable cause existed to arrest the plaintiff for child molestation.  In <u>Benson</u>, the plaintiff was walking in a park in Atlanta, Georgia, when he encountered a woman and her two-

year old daughter. According to the plaintiff, he told the
young girl that she had a beautiful pink dress, and the child
then "grabbed her bodice, yanked it up about a half an inch
and yell[ed], Panties." Id. at 829. The plaintiff commented:
"My daughter used to wear panties just like yours." Id. The
child's mother, however, called the police department and
reported that a man had approached them and asked her daughter
about the color of her panties. Id. at 829-30. The police
department responded to the park and located the plaintiff.
The responding officer detained the plaintiff in a police
wagon while he conducted an investigation. He interviewed the
mother, who told them that the plaintiff had asked her
daughter "if her panties were pretty and matched her dress."
Id. at 830. The officer discussed the incident with three
other officers, one of whom also called an assistant district
attorney about the case. All of the officers and the
assistant district attorney agreed that probable cause existed
to arrest the plaintiff for child molestation. Id.

Because there was a dispute over critical facts, the
district court denied qualified immunity and conducted a jury
trial on the plaintiff's § 1983 claim for false arrest. Id.
The jury awarded damages for the plaintiff. On appeal, the
Eleventh Circuit examined whether the defendant officer had
arguable probable cause to arrest the plaintiff for child
molestation. Id. at 834. The Eleventh Circuit answered no.

_Id._ at 835. Importantly, the Eleventh Circuit stated: "Arguable probable cause does not exist if it is 'clear that the conduct in question does not rise to the level of a crime, under the facts known at the time.' This is an objective standard, and the officer's subjective intent, beliefs, or inferences are not part of the inquiry." _Id._ at 834 (citing _Rushing v. Parker_, 599 F.3d 1263, 1266 (11th Cir. 2010) (an officer's "'subjective beliefs about the matter, however induced, are actually irrelevant to the inquiry'" (quoted source omitted)). Thus, it was of no moment that the defendant officer had received advice from an assistant district attorney and his fellow officers or that he truly believed a crime had been committed. The question is whether a reasonable officer would have believed a crime had been committed. The answer to that question here, as it was in _Benson_, is no.

Because the Court finds that no reasonable officer in the same circumstances and possessing the same knowledge as the Defendants could have believed the conduct in question rose to the level of a crime, arguable probable cause did not exist. Thus, Defendants Jones and Nalley are not entitled to qualified immunity.

**B.    Unlawful Search**

Plaintiff's claim for unlawful search stems from the search warrant obtained from the county magistrate judge to

search his fiancee's home to find articles of clothing allegedly worn by the suspect. It is axiomatic that a search warrant must be supported by probable cause. 4th Amendment (quote); <u>United States v. Carson</u>, 520 F. App'x 874, 888 (11th Cir. 2013). "Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location." <u>United States v. Flowers</u>, 531 F. App'x 975, 981 (11th Cir. 2013).

The problem in this case is that Defendant Nalley sought a warrant to locate clothes as evidence of a non-existent crime. Thus, as a matter of law, the search warrant was sought without a fair probability that contraband or evidence of a crime would be located. For this reason, Plaintiff is also entitled to partial summary judgment on his § 1983 unlawful search claim.

**C. State-Law Claims**

The remaining claims in the case are state law claims of negligence and malicious prosecution against Defendant City of Grovetown. Because the federal claim of malicious prosecution required Plaintiff to prove the elements of a Georgia state law claim of malicious prosecution, Plaintiff is entitled to partial summary judgment as to liability on the state law claim of malicious prosecution.

With respect to the negligence claim, Georgia courts have

explained that there is no action for negligent false arrest or negligent prosecution. See First Union Bank of Ga. v. Daniel, 368 S.E.2d 768, 770 (Ga. Ct. App. 1988) (citing Stewart v. Williams, 255 S.E.2d 580, 581-82 (Ga. 1979)). Indeed, to the extent that Defendants committed malicious prosecution, any loss arising from their conduct has been caused by intentional acts, not negligence. While Plaintiff could conceivably state a claim for negligence based upon a distinct act of negligence by Defendant City of Grovetown, that conduct must pertain to something other than the conduct giving rise to his federal claim of malicious prosecution. The negligence allegations in the amended complaint focus on the alleged conduct of Defendants leading up to Plaintiff's arrest, such as an improper identification process and the disregard of exculpatory evidence. (See Am. Compl. ¶¶ 153-60.) These allegations, however, support Plaintiff's claim of malicious prosecution. Thus, Plaintiff has not alleged distinct conduct supporting a separate negligence claim. Accordingly, Defendant City of Grovetown is entitled to summary judgment on the negligence claim.[6]

The Court recognizes that Plaintiff moved for judgment as a matter of law that Defendant City of Grovetown has waived

---

[6] Of note, Plaintiff did not respond to Defendants' motion for summary judgment on the negligence claim. (See Defs.' Mot. for Summ. J., Doc. 58, at 15.) Accordingly, it appears Plaintiff has abandoned the claim in any event.

its sovereign immunity with the purchase of liability insurance. At this time, the Court will defer resolution of this issue.

### IV. CONCLUSION

Upon the foregoing, Defendants' motion for summary judgment (doc. 58) is **DENIED IN PART** and **GRANTED IN PART**. Plaintiff's state law claim of negligence is dismissed. Plaintiff's motion for partial summary judgment (doc. 62) is **GRANTED IN PART** in that Plaintiff has established as a matter of law that Defendants are liable for damages on the § 1983 claims for malicious prosecution and unlawful search and the state law claim for malicious prosecution. Because the Court did not consider any expert opinion from J. Douglas Parker in resolving this matter, Defendants' motion to limit his testimony (doc. 60) is **DENIED AS MOOT**. This case will proceed to trial on damages at a time and in a manner directed by the Court.

**ORDER ENTERED** at Augusta, Georgia, this 28th day of August, 2018.

J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA